# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| LONNIE VINSON, | ) | CASE NO: 1:11-CV-1259 |
| | ) | |
| Plaintiff, | ) | JUDGE WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| MTD CONSUMER GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

This case is before the undersigned United States Magistrate Judge upon referral for the preparation of a Report and Recommendation on the motion for summary judgment filed by Defendant MTD Consumer Group, Inc. ("MTD").  (Doc. No. 20.)  This case is an employment discrimination case wherein Plaintiff Lonnie Vinson ("Vinson") alleges that MTD, his former employer, discriminated against him in the terms and conditions of his employment on the basis of his race.  For the reasons set forth below, the Magistrate Judge recommends that MTD's motion for summary judgment be DENIED in part and GRANTED in part.  Specifically, it is recommended that the Court: (1) deny MTD summary judgment with respect to Vinson's claims, in Counts II and III of his Complaint, based on MTD's failure to promote him to the Lead Weld position in January 2006; and (2) grant MTD summary judgment with respect to Vinson's remaining claims, including those claims in Counts II and III arising out of MTD's failure to promote him in June 2009, February 2010 and June 2010, and Counts I, IV, V, and VI of the Second Amended Complaint.

**I.**

### A.    Factual Background

#### 1.    Introduction

This case arises out of Vinson's employment with Commercial Turf Products ("CTP"), a wholly-owned subsidiary of MTD that manufactures outdoor power equipment.  (Corrected Motion for Summary Judgment ("Summary Judgment Motion" at 2, n.1, Doc. No. 20 at 2, n.1.)  Vinson alleges that, on four occasions, CTP failed to promote him on the basis of his race.  Specifically Vinson alleges that he was denied the following promotions: (1) a January 2006 Lead Weld position; (2) a June 2009 Lead Robot Weld position; (3) a February 2010 Temporary Lead Weld position; and (4) a June 2012 Fabrication Coach position.  The following facts are not in dispute.

#### 2.    Relevant MTD Policies

 Vinson worked at the CTP facility in Streetsboro, Ohio.  (Summary Judgment Motion at 2, Doc. No. 20 at 2.)  CTP has implemented a progressive disciplinary plan to address employee performance or other work-related problems.  (Deposition of Lonnie Vinson ("Vinson Dep.") at 41, 48-49, Doc. No. 20-1 at 11; Vinson Dep. Ex. 4 ("Employee Handbook") at 11-13, Doc. No. 20-2 at 11-13)  The first step in this process is the "verbal notification," followed by "written corrective action or performance improvement plan," and culminating in termination.  (Employee Handbook at 13; Doc. No. 20-2 at 13.)  On January 1, 2009, CTP implemented a separate Attendance Policy, under which the company tracks each employee's number of "attendance occurrences" – defined as "an absence, late, leave early or no call off" – within a rolling 12-month period that begins on the date of an employee's first attendance occurrence.  (Vinson

-2-

Dep. at 53-55, Doc. No. 20-1 at 14-15; Vinson Dep. Ex. 6 ("Attendance Policy"), Doc. No. 20-3.) Under the policy, an employee receives a "verbal warning" for each of his first three attendance occurrences, a "written warning" for his fourth, fifth and sixth attendance occurrences, and a "final warning" for his seventh, eighth and ninth attendance occurrences. (Attendance Policy at 1; Doc. No. 20-3 at 1.) The Attendance Policy provides for termination after an employee's tenth attendance occurrence in a 12-month period. (*Id.*)

CTP has also developed an Employee Peer Review Board policy, under which an employee who has been disciplined may request review of that discipline by a panel of other CTP employees. (Declaration of Kathleen Smith ("Smith Decl.") at ¶ 4, Ex. 1 ("Peer Review Board Policy"); Doc. No. 20-8 at 2, Ex. 1.) A Peer Review Board may reinstate an employee who has been discharged. (Vinson Dep. at 90-91; Doc. No. 20-1 at 24.)

Finally, employees of CTP may apply, or "bid," for other positions within the company. (Smith Decl. at ¶ 11; Doc. No. 20-8 at 5.) The application for these internal positions states that it is CTP's policy that "employees . . . have no Final Warnings within the past 12 months" to "be eligible for transfer or promotion." (*See, e.g.,* Smith Decl. Ex. 11, Doc. No. 20-8 at Ex. 11.)

### 3. Vinson's Disciplinary and Work History at MTD

Vinson began working for CTP through a temporary service in 2003, and CTP hired him as a permanent employee in January 2004. (Declaration of Lonnie Vinson ("Vinson Decl.") at ¶ 3, Doc. 28 at ¶ 3.) He operated Mig/robotic welding equipment for

-3-

the company's robotic welding department.  (*Id*.)  Throughout Vinson's tenure with CTP,

he was occasionally assigned duties as an acting lead in the welding department.  (*Id*.)

In that capacity, he "filled in as a substitute lead during certain times when either the

full-time lead was absent and/or the department needed to meet a higher production

quota."  (*Id*.)

In July 2005, CTP suspended Vinson for three days for violating its policy against

"[p]hysical contact, flirtation or advances of a sexual nature."  (Vinson Dep. at 58-60,

Doc. No. 20-1 at 16; Vinson Dep. Ex. 8, Doc. No. 20-6.)  On August 25, 2005, Vinson

received a "final written warning" arising from an August 22, 2005 incident in which he

and a CTP supervisor, Curt Cox, had a verbal altercation after Cox directed Vinson to

train another CTP employee, Josh Olds, on the robot welding equipment.  (Vinson Dep.

68-77, Doc. No. 20-1 at 18-20; Smith Decl. at ¶ 7(a), Ex. 2; Doc. No. 20-8 at 2, Ex. 2.)

In January 2006,[1] Vinson applied for an internal promotion to a Lead Weld

position at CTP.  (Vinson Dep. 183-84, Doc. No. 20-1 at 47.)  CTP promoted Russ

Mazzola, a white employee, to the position.  (Smith Decl. at ¶ 12(a), Doc. No. 20-8 at

5.)  In March 2007, Vinson received a written warning for taking extra smoking breaks

during his work hours.  (Smith Decl. at ¶ 7(b), Doc. No. 20-8 at 3; Smith Decl. Ex. 3 at

Disciplinary Action Record; Doc. No. 20-8 at Ex. 3)  On June 27, 2007, he received a

---

[1]    During his deposition, Vinson testified that it was in 2004 that he was first
       denied a promotion on the basis of his race.  (Vinson Dep. at 183-84, Doc.
       No. 20-1 at 47.)  However, in his opposition to MTD's summary judgment
       motion, Vinson does not dispute that it was in 2006 that Mazzola was
       awarded the Lead Weld position instead of him.  (*See* Response in Partial
       Opposition to the Summary Judgment Motion ("Opposition") at 5, Doc. No. 26
       at 5.)  Nor does he contend that he was denied a promotion in 2004.

Final Warning for the same conduct.  (Smith Decl. at Ex. 3 at Disciplinary Action Record, Doc. No. 20-8 at Ex. 3.)  On June 28, 2007, CTP's human resource manager advised Vinson that any further performance issues would result in termination.  (Smith Decl. at Ex. 3 at June 28, 2007 Memo, Doc. 20-8 at Ex. 3.)

On April 7, 2008, Vinson received a "verbal written warning" for attendance violations.  (Vinson Dep. at 62-63, Doc. No. 20-1 at 17; Vinson Dep. Ex. 10, Doc. No. 20-9.)  The written warning noted that Vinson had been tardy in January and April 2008, and had left early in February 2008.  (Vinson Dep. Ex. 10, Doc. No. 20-9.)

On April 10, 2008, CTP terminated Vinson's employment "for performance issues," noting that, on that date, Vinson had "refus[ed] to get a cart of cutting decks when asked by Supervisor and when explained to him that this was part of his job he still refused to do as he was asked."  (Vinson Dep. at 80-90, Doc. No. 20-1 at 21-24; Vinson Dep. Ex. 18, Doc. No. 20-10.)[2]  Vinson sought review of the termination from the Employee Peer Review Board.  (Vinson Dep. at 90, Doc. No. 20-1 at 24; Vinson Dep. Ex. 20, Doc. No. 20-11.)  On April 15, 2008, the Employee Peer Review Board decided to reinstate Vinson, with the conditions that Vinson: (1) maintain perfect attendance for 90 days; (2) receive permission from a supervisor to leave his work area for any reason other than a lunch or other scheduled break; (3) not have any write-ups for a year; and (4) not return to work until April 21, 2008.  (Vinson Dep. Ex. 20 at 3-4, Doc. No. 20-11 at

---

[2]    The written document memorializing Vinson's termination outlines his disciplinary history with CTP.  (Vinson Dep. Ex. 18, Doc. No. 20-10.)  In addition to the incidents described above, the document notes that, on November 22, 2005, Vinson was "placed on final written warning" for "creating controversy."  (*Id.*)

3-4.)

In June 2009, Vinson applied for a promotion to a Lead Robotic Weld position. (Vinson Dep. at 185, Doc. No. 20-1 at 47.)[3]  Vinson interviewed for the position on June 29, 2009.  (Smith Decl. Ex. 11, Doc. No. 20-8 at Ex. 11.)  Notes from that interview, taken by an unidentified author, reflect that Vinson "showed no leadership skills," and did not complete a leadership assessment given to applicants for the position.  (Smith Decl. Ex. 11, Doc. No. 20-8 at Ex.11.)  Under "things to work on," the author wrote, "you must learn to deal with the situations with your peers – one on one first; try to resolve it amongst you and the peer – then go to [a] sup[erviso]r."  (*Id.*)  CTP subsequently promoted Terry Van Steenburg, a white CTP employee, to the position.  (Smith Decl. at ¶ 12(b), Doc. No. 20-6 at 6.)

On June 30, 2009, CTP issued Vinson a "verbal warning" regarding attendance violations, specifically for having called off work three times, on December 15, 2008 and June 17 and 25, 2009.  (Vinson Dep. at 63-64, Doc. No. 20-1 at 17; Vinson Dep. Ex. 11, Doc. No. 20-12.)

On July 15, 2009, Shawn Vaughn, a CTP employee, alleged to CTP Director of Human Resources Kathleen Smith that, on that date, Vinson had referred to him using a racial epithet during a verbal altercation.  (Vinson Dep. Ex. 21, Doc. No. 20-13.)  On July 16, 2009, CTP again terminated Vinson's employment "for violating [its] Standard

---

[3]    During his deposition, Vinson testified that he applied for the Lead Robotic Weld position in "like late 2008, early 2009."  (Vinson Dep. at 185, Doc. No. 20-1 at 47.)  However, in his Opposition, Vinson does not dispute that he applied for the position in June 2009. (*See* Oppposition at 4, Doc. No. 26 at 4.)

of Conduct" with a "Zero Tolerance Behavior."  (Smith Decl. Ex. 5, Doc. No. 20-8 at Ex. 5.; Vinson Dep. at 98-99, Doc. No. 20-1 at 26.)  The letter notifying Vinson of his termination was accompanied by excerpts from the employee handbook, with highlight portions indicating that "Zero Tolerance Behaviors" included "racial or gender based harassment, including behaviors which display a prejudiced attitude such as bigoted statements, writings or gestures."  (Smith Decl. Ex. 5, Doc. No. 20-8 at Ex. 5.)  Another excerpt from the handbook defined "harassment" to include "[j]okes, derogatory comments, expressions or gestures of a sexual nature."  (*Id.*)

Vinson sought review of the termination from the Employee Review Board, claiming that it was actually Vaughn who had used a racial epithet to refer to Vinson. (Vinson Dep. at 99-100, Doc. No. 20-1 at 26; Vinson Dep. Ex. 23, Doc. No. 20-14.)  On July 23, 2009, the Peer Review Board reinstated Vinson, with the condition that he was no longer eligible to seek review using the Peer Review Board "if terminated in the future for any reason . . . for an indefinite amount of time."   (Vinson Dep. at 102-03, Doc. No. 20-1 at 27; Vinson Dep. Ex. 23; Doc. No. 20-14.)

On September 11, 2009, MTD issued Vinson a "written warning" regarding attendance violations, noting that he had left early and called off in December 2008, had called off three times throughout June and July 2009, and had "no call no show[ed]" on September 8, 2009.  (Vinson Dep. at 65-66, Doc. No. 20-1 at 17-18; Vinson Dep. Ex. 12, Doc. No. 20-15.)

In February 2010, Vinson applied for a Temporary Lead Weld position with CTP. (Smith Decl. at ¶ 12(d), Doc. No. 20-8 at 6-7.)  CTP promoted Pete Robeson, a white

employee, to the position.  (Smith Decl. at ¶ 12(d), Doc. No. 20-8 at 6-7; Vinson Dep. at 187, Doc. No. 20-1 at 48.)  In June 2010, Vinson applied for a position as Welding Fabrication Coach.  (Smith Decl. at ¶ 12(f), Doc. No. 20-8 at 7.)[4]  CTP awarded the position to Richard Sopcak.  (Smith Decl. at ¶ 12(f), Doc. No. 20-8 at 7.)

In July 2010, CTP Manager James Winning and Frank Danks, who was Vinson's supervisor, drafted a "Coaching Action Plan" for Vinson.  (Vinson Dep. at 195-97, Doc. No. 20-1 at 50; Vinson Dep. Ex. 42, Doc. No. 20-21.)  The written plan states that it was intended to give Vinson "the opportunity to show [Danks and Winning] that he does have leadership capabilities."  (Vinson Dep. Ex. 42, Doc. No. 20-21.)  Under the heading "Area(s) Requiring Improvement," Danks and Winning noted that Vinson "needs to develop a 'Can Do' and 'Will Do' attitude;" that Vinson's supervisors did not "want to hear that he does not want anything to do with the robots, or any other job in the back;" and that Vinson needed to "know the rates on any job that is asked of him, and ensure that he is hitting those rates."  (*Id.*)  Vinson signed the Plan on July 16, 2010.  (*Id.*)

In October 2010, CTP terminated Vinson after he accumulated ten attendance occurrences within a three-week span of time.  (Smith Decl. at ¶¶ 8-9, Doc. No. 20-8 at 4.)

---

[4]    During his deposition, Vinson testified that he had applied for "one more" position in "early 2010."  (Vinson Dep. at 188, Doc. No. 20-1 at 48.)  In his Opposition, Vinson does not dispute that the position in question was the temporary lead weld position discussed in Smith's Declaration.  (*See* Opposition at 4, Doc. No. 26 at 4.)

-8-

### B.    Procedural Background

On August 3, 2011, Vinson filed his second amended complaint, alleging that MTD: (1) deprived him of employment opportunities, including opportunities for advancement, on the basis of his race, in violation of Ohio Revised Code §§ 4112.02 and 4112.99 (Second Amended Complaint ("Compl.") at Count II, Doc. No. 6 at 5-6); and (2) discriminated against him on the basis of his race with respect to his contract rights, in violation of 42 U.S.C. § 1981(b)  (Compl. at Count III, Doc. No. 6 at 6-7.)[5]  On August 10, 2012, after filing its original motion, which contained clerical errors, and receiving leave to do so, MTD filed a corrected motion for summary judgment. (Summary Judgment Motion, Doc. No. 20.)  On September 26, 2012, Vinson filed his Opposition.  (Doc. No. 26.)  On November 30, 2012, MTD filed its Reply.  (Reply to Plaintiff's Opposition, Doc. No. 29.)

### II.

Here, MTD argues that it is entitled to summary judgment on Vinson's claims that it discriminated against him on the basis of his race by failing to promote him.  MTD's arguments are two-fold.  First, it argues that Vinson cannot establish a *prima facie* case

---

[5]    Vinson's second amended complaint also contained allegations that MTD had terminated him on the basis of his race, in violation of R.C. §§ 4112.02 and 4112.99, and 42 U.S.C. § 2000e-2, and that MTD's denial of equal employment opportunities and other mistreatment violated § 2000e-2.  (Compl. at Counts I, IV, V and VI, Doc. No. 6 at 5, 7-8.) However, in his response to MTD's motion for summary judgment, Vinson "elected not to oppose summary judgment as it relates to" those claims. (Plaintiff's Response in Partial Opposition ("Pl. Opp." or "Opposition") at 1, n.2, Doc. No. 26 at 1, n.2.)  Accordingly, it is recommended that the Court grant MTD summary judgment on Counts I, IV, V and VI of the second amended complaint.

of racial discrimination because, based on his disciplinary history with the company, he was neither objectively qualified for the internal positions, nor similarly situated to, or similarly qualified as, the individuals who received the promotions at issue.  Second, it argues that, even if Vinson can demonstrate a *prima facie* case of discrimination on the basis of his race, his disciplinary history and lack of leadership skills were legitimate nondiscriminatory reasons for not promoting him.

Vinson argues that he was qualified for the positions on the basis of his experience and training, and that MTD cannot rely on the same deficiencies to both defeat his *prima facie* case and serve as the legitimate nondiscriminatory reasons for its failure to promote him.  Further, Vinson contends that MTD cannot rely on its stated legitimate nondiscriminatory reasons for declining to promote him because the company has not offered any evidence of the decision makers' actual reasons for denying him the relevant promotions.  Vinson also asserts that he has offered sufficient evidence that MTD's purported reasons for declining to promote him were pretext for race-based discrimination.

The Court will address each argument in due course.

**A.      Standard of Review**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party can meet this burden in two ways:  by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing that the nonmoving party, after adequate time for discovery, fails to show sufficient

-10-

evidence to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must set forth through competent and material evidence of specific facts showing that there is a genuine issue for trial. *See Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). The trial court has no duty to search the entire case record to establish that it is bereft of a genuine issue of material fact. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to rely. *Al-Qudhai'een v. Am. W. Airlines, Inc.*, 267 F. Supp. 2d 841, 845 (S.D. Ohio 2003) (citing *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)). The lack of such a response by the nonmoving party may result in an automatic grant of summary judgment. *Reeves v. Fox Television Network*, 983 F. Supp. 703, 709 (N.D. Ohio 1997).

In reviewing summary judgment motions, a court must view all facts and inferences drawn therefrom in a light most favorable to the nonmoving party. *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 498 (6th Cir. 1990). However, the Court does not weigh the evidence or make credibility determinations. *Joostberns v. United Parcel Services, Inc.*, 166 F. App'x 783, 787 (6th Cir. 2006). Moreover, the mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmoving

-11-

party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  In other words, the court should determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  *Id.* at 251.

When evaluating cross-motions for summary judgment, the court is obligated to analyze each motion on its own merits and view the facts and inferences in the light most favorable to the nonmovant.  *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## B.    Legal Framework

Vinson alleges that CTP's failure to promote him violated §§ 4112.02 and 4112.99 of the Ohio Revised Code and  42 U.S.C. § 1981(b).  In relevant part, § 4112.02 makes it an "unlawful discriminatory practice . . . [f]or any employer, because of the race . . . of any person . . . to discriminate against that person with respect to hire, tenure, terms, conditions or privileges of employment."  Ohio Rev. Code § 4112.02(A).  Section 4112.99 creates a civil right of action against an employer who violates § 4112.02.  *See* Ohio Rev. Code § 4112.99 ("Whoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief.").  Section 1981 provides that "[a]ll persons with the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Subsection (b) defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and

-12-

conditions of the contractual relationship." 42 U.S.C. § 1981(b).

In analyzing claims under both § 4112.02 and § 1981, courts employ the familiar burden-shifting framework otherwise applied to claims under Title VII.  *See Peters v. Lincoln Elec.*, 285 F.3d 456, 469 (6th Cir. 2002) (applying the Title VII burden-shifting framework to a claim under § 4112.02); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021, n.2 (6th Cir. 2000) ("The standards for Title VII are equally applicable to Dew's claims under [§ 1981] and [§ 4112.02].")  Accordingly, Vinson's claims stand or fall together.  Under the burden-shifting framework, "a plaintiff generally must demonstrate that: (1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions."  *Dews*, 231 F.3d at 1020-21.  After a plaintiff creates a presumption of discrimination by establishing a *prima facie* case, a defendant may rebut that presumption by offering a legitimate nondiscriminatory reason for failing to promote the plaintiff.  *Id*. at 1021.  "The plaintiff then bears the burden of showing that the defendant's proffered reason is pretextual."  *Id*.

C.     **Whether Vinson Has Established a *Prima Facie* Case of Discrimination**

MTD argues that Vinson cannot establish a *prima facie* case of discrimination because he was neither objectively qualified for the promotions that he sought, nor similarly situated to – or similarly qualified as –  the employees who received the promotions.  To support its arguments, MTD points to Vinson's disciplinary history and alleged lack of leadership skills as evidence that he was not qualified, or not as qualified

-13-

as his fellow CTP employees, for the promotions at issue.  Vinson contends that he was objectively qualified for the positions, and that MTD's argument on this point is improper because MTD relies on the same issues – disciplinary history and lack of leadership skills – as its legitimate nondiscriminatory reason for failing to promote him.

MTD's arguments are foreclosed by the relevant law in this Circuit, particularly by the Sixth Circuit's decision in *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (2003) (*en banc*).  In that case, the plaintiff – a former furniture store manager – alleged that the defendant had demoted him to a sales position on the basis of his age.  The defendant proffered the same reason – declining store sales – as a basis for asserting both that the plaintiff was not qualified for the management position and as its legitimate nondiscriminatory reason for the demotion.  The district court granted summary judgment to the defendant, deciding, in part, that the plaintiff had failed to establish a *prima facie* case because he was not qualified for the management position. The Sixth Circuit reversed, discussing two reasons that the district court had erred in relying on the store's declining sales to determine that the plaintiff had not established a *prima facie* case.

First, the Sixth Circuit noted that the defendant was precluded from relying on the same reason to contend both that the plaintiff could not establish a *prima facie* case and that it had a legitimate nondiscriminatory reason for its action:

> [A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case.  To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

-14-

317 F.3d at 574 (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000).

Second, the Sixth Circuit emphasized that, at the *prima facie* stage of the burden-shifting analysis, a court must consider whether the plaintiff was "objectively qualified" for the relevant position when deciding whether a plaintiff has satisfied "the qualification prong" of the *prima facie* test:

> At the *prima facie* stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job. The *prima facie* burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

*Id.* at 575-76 (citations omitted) (emphasis in original).

Here, MTD's argument regarding Vinson's *prima facie* case runs afoul of *Wexler* in two ways. First, MTD asks this Court to consider its alleged legitimate nondiscriminatory reasons for not promoting Vinson – his disciplinary history and his lack of leadership skills – in analyzing his *prima facie* case. *Wexler* forbids this. *See, e.g., Skelton v. Sara Lee Corp.*, 249 F. App'x 450, 459 (6th Cir. 2007) (citing *Wexler* and noting that the district court erred when it "improperly viewed [the plaintiff's] asserted superior experience through the prism of [the defendant's] alleged nondiscriminatory retainment criteria"). Second, rather than address whether Vinson's "education, experience . . . and . . . general skills" were appropriate for the available

-15-

positions, *Wexler*, 317 F.3d at 576, MTD points, in part, to Vinson's lack of  leadership

skills to argue that he was not qualified, or not as qualified as his peers, for the

positions he sought.[6]   These subjective measures, however, are not appropriate for

consideration at the *prima facie* stage of the burden-shifting analysis.  *Id.* at 575 (citing

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (*en banc*) (noting

that "courts traditionally treat explanations that rely heavily on subjective considerations

with caution," and that "an employer's asserted strong reliance on subjective feelings

about the candidates may mask discrimination")).

MTD also argues that Vinson was not qualified for three of the four positions he

sought because he had received Final Warnings within the 12 months prior to applying

for them.   The evidence, however, demonstrates a genuine issue of fact regarding

whether receiving a Final Warning with the 12 months prior to applying for a promotion

actually disqualified a CTP employee from receiving the positions Vinson sought.  In

support of its motion, MTD submitted the application used by CTP employees to apply

for internal positions.  (*See, e.g.,* Smith Decl. Ex. 11, Doc. No. 20-8 at Ex. 11.)  The

application states that it is CTP's policy that "employees . . . have no Final Warnings

within the past 12 months" to "be eligible for transfer or promotion."  (*Id.*)  Were this the

only evidence on this issue, MTD's argument might stand.  However, in support of his

Opposition, Vinson avers that Pete Robeson received a Final Warning within the 12

---

[6]      In support of his Opposition, Vinson submitted a copy of his resume,
which details his training and experience as a welder.  (Vinson Decl. Ex.
1; Doc. No. 28-1.)  MTD does not argue that Vinson's experience and
training were insufficient to qualify him for the positions he sought.

months prior to his promotion to the Temporary Lead Weld position posted by MTD in February 2010.  (Vinson Decl. at ¶ 7, Doc. No. 28 at 3.)  In support of this contention, Vinson submitted copies of: (1) Robeson's application for the position, dated February 25, 2010 (Vinson Decl. Ex. 4; Doc. No. 28-4); and (2) a March 18, 2009 "Re-Issued Final Warning,"[7] signed by Robeson on that date, reflecting that Robeson had violated MTD's policies eleven times throughout 2008 and 2009.   (Vinson Decl. Ex. 6, Doc. No. 28-6).[8]

       There is no dispute that Vinson applied for the Temporary Lead Weld position, and that it was awarded to Robeson in early March 2010.  (Smith Decl. at ¶ 12(d), Doc. No. 20-8 at 6-7; Vinson Decl. at ¶ 7, Doc. No. 28 at 3.)  Considered in the light most favorable to Vinson, the evidence reflects that, at some point after February 2010, MTD promoted Robeson to a position for which Vinson had also applied, despite the fact that Robeson had been issued a Final Warning during the prior 12 months.[9]   Thus, there is

---

[7]    Robeson received a Final Warning in October 2008.  (Vinson Decl. Ex. 5, Doc. No. 28-5.)  That Final Warning noted that Robeson had violated CTP's policies seven times between June and October 2008.  (*Id*.)  The March 18, 2009 "Re-Issued Final Warning" cites to the seven violations listed in the October 2008 Final Warning, and lists four additional violations that occurred in March 2008 and March 2009.  (Vinson Decl. Ex. 6, Doc. No. 28-6.)

[8]    Vinson avers that he has provided "true and accurate copies" of Robeson's February 2010 application and the March 2009 Reissued Final Warning.  (Vinson Decl. at ¶ 7; Doc. No. 28 at 3.)  He does not, however, explain his basis for that assertion.  Nonetheless, MTD does not challenge either the authenticity or the admissibility of these documents.  Thus, this Court will consider them.

[9]    MTD does not contest that Robeson had received a Final Warning within 12 months of his promotion to Temporary Lead Weld.  In her declaration, Smith notes, "Although Robeson's personnel file contains warnings for

-17-

a genuine issue of fact regarding whether CTP actually required an employee to be free of Final Warnings for the 12-month period prior to receiving a transfer or promotion, and, by extension, whether Vinson's disciplinary history rendered him objectively unqualified, or less qualified than other MTD employees, for the positions he sought. Accordingly, MTD is not entitled to summary judgment on the issue of whether Vinson has established a *prima facie* case of discrimination with respect to MTD's failure to promote him.

### D.   Whether MTD Has Met Its Burden of Production By Putting Forth Legitimate Nondiscriminatory Reasons for Declining to Promote Vinson

Because Vinson has established a *prima facie* case of race-based discrimination, the burden shifts to MTD to articulate legitimate nondiscriminatory reasons for its decisions not to promote Vinson.  *See Dews*, 231 F.3d at 1020-21. Here, MTD again contends that it declined to promote Vinson on the basis of his disciplinary history and lack of leadership skills.  (Summary Judgment Motion at 26-28, Doc. No. 20 at 26-28.)  Vinson argues that MTD has failed to meet its burden of production on this issue because it has "not provided any admissible evidence as to the *actual proffered reason* for why [MTD] rejected Vinson in 2006, 2009 and 2010." (Opposition at 12, Doc. No. 26 at 12 (emphasis in original).)  According to Vinson,

---

*attendance* violations, based on my review of the file, I did not see any disciplinary records relating to *conduct* violations with the exception of a Verbal Warning for a minor housekeeping issue in 2005."  (Smith Decl. at ¶ 12(d); Doc. No. 20-8 at 6-7.) (emphasis added)  Although Smith makes a distinction between "attendance" violations and "conduct" violations, MTD points to nothing in the record reflecting that the distinction is relevant to whether an employee is qualified for a promotion or transfer.

-18-

although the evidence submitted by MTD contains his disciplinary history and statements from various CTP personnel that he lacked leadership skills, because MTD has not offered admissible evidence connecting these issues to the decisions not to promote him, MTD has not sustained its burden on this issue.

The burden on the defendant at this step of the burden-shifting analysis is not onerous.  Rather, it is  "one of production, not persuasion; it can involve no 'credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).  However, it is well established that a defendant must satisfy its burden of production "through the introduction of admissible evidence."  *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 255 (1981).  Accordingly, "[a]n articulation not admitted into evidence will not suffice.  Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel."  *Id.* at 255, n.9.

In *Clay v. United Parcel Serv.*, 501 F.3d 695 (6th Cir. 2007), the Sixth Circuit examined the defendant's burden at this step of the burden-shifting analysis, emphasizing the necessity of admissible evidence to support defendant's asserted reasons for the challenged conduct.  In that case, the defendant failed to offer a customer service position to one of its employees, who later alleged race-based discrimination.  The defendant contended that it had not offered the position to the plaintiff because the position was not available to employees who were working at the plaintiff's location.  However, to support its allegation, the defendant offered only the affidavit of a supervisor, attesting that the position had been filled by an employee from

-19-

another location, and an intent sheet – the form used by employees to express an interest in the position – reflecting that the position had been posted at that other location.  In reversing the district court's grant of summary judgment to the defendant, the Sixth Circuit noted that, while the defendant's explanation "*could* constitute a legitimate nondiscriminatory reason for not giving the position to" the plaintiff, the defendant had failed to meet its burden of production because it failed to cite "any affidavits or other evidence that states that" it intended to fill the position with employees from a different location, and because the admissible evidence it proffered did not "clearly set forth . . . the reasons" why the plaintiff was ineligible for the position. 501 F.3d at 706-07 (emphasis added).

In this case, MTD's reliance on Vinson's disciplinary history as a legitimate nondiscriminatory reason for its failure to promote him suffers from the same evidentiary infirmities as the defendant's explanation in *Clay*.  In support of its contention that Vinson's disciplinary issues prevented his promotion, MTD points to: (1) Vinson's deposition testimony and exhibits (Doc Nos. 20-1 through 20-7, 20-9 through 20-21); and (2) the declaration of Kathleen Smith and its accompanying documents (Doc. No. 20-8.)  Although these documents and testimony describe Vinson's extensive disciplinary history at CTP, nothing in the evidence connects Vinson's conduct issues to the decisions to deny him promotions.  Smith's declaration merely describes the documents in Vinson's personnel files, which in turn reflect that Vinson was repeatedly disciplined for various reasons.  None of the documents submitted in support of the Summary Judgment motion reflect that CTP denied Vinson

-20-

a promotion based on his conduct.  MTD failed to provide the affidavits or testimony of the relevant CTP decision makers who could attest that Vinson's disciplinary issues were the reason he was not promoted.  As in *Clay*, although Vinson's disciplinary history *could* serve as a legitimate nondiscriminatory reason for the decisions not to promote him, MTD has failed to articulate that reason "through the introduction of admissible evidence."  *Burdine*, 450 U.S. at 255.  Accordingly, MTD has not sustained its burden of production with respect to its explanation that Vinson's disciplinary history precluded him from receiving promotions.

MTD also contends that it failed to promote Vinson due to his lack of leadership skills.  Unlike the evidence related to Vinson's disciplinary history, the evidence submitted by MTD sufficiently articulates this reason, at least with respect to CTP's decision not to award Vinson the June 2009 Lead Robotic Weld position, the February 2010 Temporary Lead Weld, or the June 2010 Fabrication Coach position.  In her declaration, Smith notes that, "[t]here is documentation noting lack of leadership ability as reasons why . . . Vinson . . . [was] not selected for the [June 2009 Lead Robotic Weld] position."  (Smith Decl. at ¶ 12(c), Doc. No. 20-8 at 6).  Further, the notes from Vinson's June 29, 2009 interview state directly that CTP did not offer Vinson the position because he "showed no leadership skills" and had not completed the leadership assessment.  (Smith Decl. Ex. 11, Doc. No. 20-8 at Ex. 11.)  Smith also avers that she participated in the interviews for the February 2010 Temporary Lead Weld position, and that, "[d]uring the interviews, when asked how he would handle various situations, Vinson typically responded that he would take the issue to his

-21-

supervisor.  This demonstrated a  lack of leadership or the ability to handle the issues

himself."  (Smith Decl. at ¶ 12(e), Doc. No. 20-8 at 7.)   With respect to the Fabrication

Coach position, Smith states, "[i]t is my understanding that Vinson was not selected for

this position because Vinson was viewed as lacking in the leadership skills necessary

for a Coach position compared to" the CTP employee who received the position.

(Smith Decl. at ¶ 12(f), Doc. No. 20-8 at 7.)[10]   MTD offers no evidence that CTP denied

Vinson the promotion to the Lead Weld position in January 2006 on the basis of his

lack of leadership skills.  Accordingly, MTD has sustained its burden of production with

respect to its legitimate nondiscriminatory reasons for not promoting Vinson to: (1) the

June 2009 Lead Robotic Weld position; (2) the February 2010 Temporary Lead Weld

position; and (3) the June 2010 Fabrication Coach position, but not with respect to the

January 2006 Lead Weld position.  Because it failed to sustain its burden of production

with respect to its reason for not promoting Vinson to the Lead Weld position in January

2006, MTD is not entitled to summary judgment with respect to Vinson's claims based

---

[10]     Vinson argues that Smith's statement regarding the Fabrication Coach
position is insufficient to sustain MTD's burden because she does not
identify the decision maker who declined to award Vinson the position.
He cites to *Turner v. Kansas City Southern Ry. Co.*, 675 F.3d 887 (5th Cir.
2012) to support his argument.  In addition to not being binding on this
Court, *Turner* is distinguishable from the facts of this case.  In *Turner*, the
Fifth Circuit determined that the defendant failed to satisfy its burden of
production because, although the defendant identified the individual who
had made the disciplinary decisions at issue in the case, the defendant
offered no evidence regarding why that individual had imposed the
discipline as he had.  Because there was no evidence regarding the
decision maker's reasoning "at the time he made those decisions," the
court concluded that the defendant had failed to satisfy its burden.  675
F.3d at 904.  Here, although Smith does not aver that she made the
decision not to promote Vinson, she does provide a specific reason for
that decision.

on that position.

     **E.**     **Whether MTD's Proffered Legitimate Nondiscriminatory Reasons Are Pretext for Race-Based Discrimination**

Because MTD has sustained its burden of proof with respect to three of the four promotions at issue, the burden shifts back to Vinson to show that MTD's proffered reasons for declining to promote him to those positions are pretextual.  *Dews*, 231 F.3d at 1021.  A plaintiff can demonstrate pretext by showing that the defendant's proffered reasons for the adverse employment action: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) were insufficient to warrant the challenged conduct. *See id.*  Further, Vinson must "produce sufficient evidence from which the jury could reasonably reject [MTD's] explanation and infer that [MTD] intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (internal quotation marks and alterations omitted).  Accordingly, Vinson must "allege more than a dispute over the facts upon which" the decisions not to promote him were based, but, rather, must "put forth evidence that [MTD] did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Id*. at 493-94 (internal quotation marks and citations omitted).

Here, Vinson makes several arguments to support his contention that MTD's stated reason for not promoting him – his lack of leadership skills – is pretext for discrimination.  He alleges that MTD's explanation is false, and takes issue with the veracity of several pieces of information in the record.  In his declaration, Vinson states, "I deny Kathy Smith's statement that she made accusing me of not sitting up straight during the [June] 2009 interview, *the reason she gave me for why I lost out on that*

*promotion*." (Vinson Decl. at ¶ 6, Doc. No. 28 at 2 (emphasis added).)  Vinson also

takes issue with MTD's characterization of the July 2009 decision of the Peer Review

Board as a "last chance agreement," arguing that "the reinstatement decision merely

stated that he was no longer permitted to use the peer review process in the future."

(Opposition at 15, Doc. No. 26 at 15.)  According to Vinson, this "competing evidence"

gives rise to genuine issues of material fact regarding whether MTD's criticisms

regarding his leadership skills are true.  Although, in this context, a plaintiff may

establish pretext by asserting that the defendant's explanation is false, here, MTD

offered neither of these issues – whether Vinson sat up in his chair during his June

2009 interview or whether the Peer Review Board's July 2009 decision constituted a

last chance agreement – as an explanation for CTP's decisions not to promote Vinson.

Accordingly, this argument is not sufficient to establish pretext in this case.[11]

Vinson also states  that he was given conflicting information regarding who made

the decision – Smith or Danks — not to promote him in June 2009.  (Vinson Decl. at ¶

8, Doc. No. 28 at 2.)  He argues that this inconsistency "undermines" MTD's credibility.

---

[11]     Vinson cites to *Archer v. Mesaba Aviation, Inc.*, 210 F.3d 371 (Table), 2000 WL 376677 (6th Cir. Apr. 3, 2000) (unpublished table decision), to support his argument on this point.  The facts of *Archer* are distinguishable, however.  In that case, the plaintiff and a non-party offered affidavits contradicting the employer's version of the central event upon which the employer relied as its explanation for terminating the plaintiff.  In reversing the district court's grant of summary judgment to the employer, the Sixth Circuit observed that, "[c]rucially, because the alleged event was the basis of Plaintiff's termination, a material fact exists." 2000 WL 376677 at * 4.  Here, neither issue discussed by Vinson was the alleged basis – or central reason –  for MTD's decisions not to promote him.

-24-

However, it is well established that, at the summary judgment stage, a court may not weigh the credibility of the evidence. *See Joostberns*, 166 F. App'x at 787.  Further, because Vinson does not contend that CTP gave him conflicting reasons for declining to promote him, his assertions regarding Danks and Smith do not contradict MTD's stated explanation for declining to promote him in June 2009.

Finally, Vinson alleges that evidence of pre-selection and of his supervisor's racial bias demonstrate that MTD's explanation for failing to promote him is pretext. In his declaration, Vinson asserts that: (1) in 2005, Danks instructed him to begin training Mazzola on lead responsibilities before posting the June 2006 Lead Weld position that was eventually offered to Mazzola; (2) in early 2009, CTP supervisors began training Van Steenberg on lead responsibilities prior to posting the June 2009 Lead Robotic Weld position that was eventually offered to Van Steenburg; (3) in early 2010, Danks began training Robeson on lead responsibilities prior to posting the February 2010 Temporary Lead Welder position that was eventually offered to Robeson; and (4) in July 2010, MTD promoted Sopchak to the Fabrication Coach position without interviewing Vinson, who had also applied for the position.  (Vinson Decl. at ¶¶ 5-7, 9, Doc. No. 28 at 2-4.)  Vinson also points to his deposition testimony that Danks interacted differently with Vinson than with white employees, and subjected him to different discipline than white employees, and that Danks suggested that Vinson could come "park cars" and pose "in the yard with a lamp" during a party at Dank's house. (Vinson Dep. at 191, 203-05, Doc. No. 20-1 at 49, 52.)  MTD does not reply to Vinson's allegations.

-25-

"Evidence of preselection operates to discredit the employer's proffered explanation for its employment decision." *Goostree v. Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986).  Further, evidence of disparate treatment and of racially biased remarks can reflect racial animus sufficient to establish pretext.  *See, e.g., Johnson v. Kroger Co.*, 319 F.3d 858, 868-69 (6th Cir. 2003).  Here, Vinson asserts that MTD engaged in preselection, and that he was subject to disparate treatment and racially-based comments from supervisors.  However, Vinson offers no evidentiary support for his contentions regarding CTP's treatment of other employees.  Rather, his allegations are conclusory and general.  Given this lack of detail, and because Vinson's allegations do not address MTD's proffered explanation that he lacked leadership skills, this evidence of pretext is not "sufficient . . . for a jury to return a verdict" in his favor.  *Anderson*, 477 U.S. at 249; *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (noting that, to succeed in demonstrating pretext by showing that the employer's stated reason did not actually motivate the adverse action, an employee must "indict the credibility of [the] employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant"), *overruled on other grounds as recognized in Geiger v. Tower Automotive*, 579 F.3d 614, 621 (6th Cir. 2009).  Accordingly, MTD is entitled to summary judgment with respect to Vinson's claims based on CTP's failure to promote him to: (1) the June 2009 Lead Robot Weld position; (2) the February 2010 Temporary Lead Weld position; and (3) the June 2010 Fabrication Coach position

-26-

**III.**

For the foregoing reasons, the Magistrate Judge recommends that MTD's motion for summary judgment be DENIED in part and GRANTED in part.  Specifically, it is recommended that the Court: (1) deny MTD summary judgment with respect to Vinson's claims, in Counts II and III of his Complaint, based on MTD's failure to promote him to the Lead Weld position in January 2006; and (2) grant MTD summary judgment with respect to Vinson's remaining claims, including those claims in Counts II and III arising out of MTD's failure to promote him in June 2009, February 2010 and June 2010, and Counts I, IV, V, and VI of the Second Amended Complaint.


                                        s/ Nancy A. Vecchiarelli
                                        U.S. MAGISTRATE JUDGE


Date: January 24, 2012


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**